No. 23-15385

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Charles E. Nealy, Jr.,

Plaintiff-Appellant,

v.

David Shinn, et. al.,

Defendants-Appellees.

On Appeal from a Final Judgment of the
United States District Court for the District of Arizona
No. 20-cv-1488, Judge Douglas L. Rayes

## REPLACEMENT OPENING BRIEF FOR PLAINTIFF-APPELLANT
## CHARLES E. NEALY, JR.

| | |
|---|---|
| Elijah Conley | Natasha R. Khan |
| Meghan Plambeck | Brian Wolfman |
| Zarah Zhao | Regina Wang |
| Student Counsel | GEORGETOWN LAW APPELLATE |
| | COURTS IMMERSION CLINIC |
| | 600 New Jersey Ave., NW, |
| | Suite 312 |
| | Washington, D.C. 20001 |
| | (202) 661-6582 |

Pro Bono Counsel for Plaintiff-Appellant Charles E. Nealy, Jr.

October 6, 2023

# Table of Contents

Introduction ................................................................................1

Statement of Jurisdiction...........................................................2

Issues Presented .........................................................................3

Constitutional and Statutory Addendum ..................................3

Statement of the Case ................................................................3

    I.     Factual background ........................................................3

    II.    Procedural history and decision below.............................9

Summary of Argument .............................................................10

Standard of Review..................................................................14

Argument ..................................................................................14

    I.     The interruption of Nealy's Jumu'ah prayer in November 2019 violated his First Amendment free-exercise rights. ........................14

        A.    The prayer interruption impinged on Nealy's sincere religious exercise. ..............................................14

        B.    The interruption of Nealy's Jumu'ah prayer was motivated by religious animus...........................................16

        C.    The violent interruption of Nealy's Jumu'ah prayer fails the *Turner* test. ........................................................18

        D.    Defendants are not entitled to qualified immunity. ...................24

    II.    The prayer interruption also violated Nealy's rights under RLUIPA. ..............................................................25

        A.    The violent interruption of the prayer imposed a substantial burden on Nealy's religious exercise. ...........................................26

        B.    Defendants did not meet their burden under RLUIPA.............28

    III.    The eight-week suspension of the Jumu'ah prayer services violated Nealy's free-exercise rights....................................31

A. The record indicates that Chaplain Willis was involved in the decision to suspend Jumu'ah for eight weeks.......................31

B. In violation of the Free Exercise Clause, Defendants discriminated against Nealy on the basis of religion.................33

 1. The suspension of Jumu'ah prayer was motivated by impermissible animus. ...............................................................33

 2. Defendants' eight-week suspension of Jumu'ah prayer was not reasonably related to a legitimate penological interest.......................................................................................36

C. Defendants are not entitled to qualified immunity on Nealy's First Amendment claim relating to the eight-week suspension. .........................................................................................39

IV. The eight-week suspension violated Nealy's RLUIPA rights. .......41

V. Nealy's claims for declaratory and injunctive relief are not moot. ....................................................................................................44

Conclusion...........................................................................................47

Certificate of Compliance .........................................................................

Addendum ..................................................................................................

# Table of Authorities

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .........................................................................14

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021) .....................................................33, 35

*Ashelman v. Wawrzaszek*,
111 F.3d 674 (9th Cir. 1997) ...........................................................21

*Barren v. Harrington*,
152 F.3d 1193 (9th Cir. 1998) ..........................................................31

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................................................................28, 30

*Canell v. Lightner*,
143 F.3d 1210 (9th Cir. 1998) .....................................................27, 28

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ....................................................................18, 33

*Elmajzoub v. Davis*,
No. 319-CV-00196-MMD-CSD, 2022 WL 1537346 (D. Nev.
May 13, 2022) ...................................................................................43

*Emad v. Boeing Co.*,
No. C14-1233 MJP, 2015 WL 4743897 (W.D. Wash. Aug. 11,
2015) .................................................................................................17

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ..........................................................................27

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, ___ F.4th ___, ___, 2023 WL 5946036 (9th Cir. Sept. 13, 2023) (en banc)..............................................................17, 18, 43

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000)...............................................................................45

*Greene v. Solano Cnty. Jail*, 513 F.3d 982 (9th Cir. 2008)...............................................25, 41, 44

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208 (4th Cir. 2016)...............................................................17

*Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308 (9th Cir. 2022)...............................................................14

*Hartmann v. Cal. Dep't of Corrs. and Rehab.*, 707 F.3d 1114 (9th Cir. 2013)...........................................................28

*Holt v. Hobbs*, 574 U.S. 352 (2015)...............................................26, 27, 28, 29, 30

*Johnson v. Baker*, 23 F.4th 1209 (9th Cir. 2022)...............................................41, 42

*Johnson v. California*, 543 U.S. 499 (2005)...............................................................................16

*Jones v. Slade*, 23 F.4th 1124 (9th Cir. 2022)........................... 11, 15, 19, 20, 26, 27

*Jones v. Williams*, 791 F.3d 1023 (9th Cir. 2015)...............................................21, 22, 26, 40

*Los Angeles County v. Davis*, 440 U.S. 625 (1979)...............................................................................45, 46

*Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006)...............................................................40

iv

*Malik v. Brown,*
    16 F.3d 330 (9th Cir. 1994) .........................................................14, 33

*Malik v. Brown,*
    71 F.3d 724 (9th Cir. 1995) ................................................................24

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,*
    138 S. Ct. 1719 (2018) .........................................................11, 12, 17, 18

*Maye v. Klee,*
    915 F.3d 1076 (6th Cir. 2019) ...........................................................24

*Mayweathers v. Newland,*
    258 F.3d 930 (9th Cir. 2001) .....................................................24, 38, 40

*McEachin v. McGuinnis,*
    357 F.3d 197 (2d Cir. 2004) ..............................................................24

*O'Lone v. Est. of Shabazz,*
    482 U.S. 342 (1987) .......................................................................14, 33, 37

*Ramirez v. Collier,*
    595 U.S. 411 (2022) ...........................................................................42

*Rosemere Neighborhood Ass'n v. EPA,*
    581 F.3d 1169 (9th Cir. 2009) ..................................................... 44-45, 46

*Salahuddin v. Goord,*
    467 F.3d 263 (2nd Cir. 2006) ..........................................................40

*Sandoval v. Las Vegas Metro. Police Dep't,*
    756 F.3d 1154 (9th Cir. 2014) ..........................................................24

*Shakur v. Schriro,*
    514 F.3d 878 (9th Cir. 2008) ......................................................38, 43

*Thornburgh v. Abbott,*
    490 U.S. 401 (1989) ............................................................................19

*Turner v. Safley*,
　482 U.S. 78 (1987) ...................................... 12, 14, 16, 18, 19, 21, 22, 33, 36, 38

*United States v. Playboy Ent. Grp.*,
　529 U.S. 803 (2000) ................................................................................ 43

*Walker v. Beard*,
　789 F.3d 1125 (9th Cir. 2015) ............................................................ 42, 43

*Ward v. Walsh*,
　1 F.3d 873 (9th Cir. 1993) ........................................... 21, 22, 36-37, 37

*Warsoldier v. Woodford*,
　418 F.3d 989 (9th Cir. 2005) ............................................................ 30, 43

*West v. Carr*,
　No. 17-CV-335-WMC, 2021 WL 4972419 (W.D. Wis. Oct. 26,
　2021) ................................................................................................ 44

*Wiggins v. Rushen*,
　760 F.2d 1009 (9th Cir. 1985) ........................................... 13, 46, 47

*Wisconsin v. Yoder*,
　406 U.S. 205 (1972) ................................................................................ 14

*Wood v. Yordy*,
　753 F.3d 899 (9th Cir. 2014) ................................................................ 10

**Statutes**

28 U.S.C. § 1291 ............................................................................................ 2

28 U.S.C. § 1331 ............................................................................................ 2

28 U.S.C. § 1343 ............................................................................................ 2

42 U.S.C. § 1983 ............................................................................................ 9

42 U.S.C. § 1997e(a) ................................................................................... 45

42 U.S.C. § 2000cc-1................................................................25

42 U.S.C. § 2000cc-3(g).........................................................25

**Other Authorities**

*Consult*, OED.com,
   https://www.oed.com/dictionary/consult_v?tab=meaning_an
   d_use#8407602 (last visited Oct. 3, 2023).....................................32

*Consultation*, OED.com,
   https://www.oed.com/dictionary/consultation_n?tab=meani
   ng_and_use#8408557 (last visited Oct. 6, 2023)..........................32

## Introduction

Charles Nealy was deep in prayer one Friday afternoon when prison officials swarmed the prayer space. They called Nealy and other Muslim prisoners "terrorists" as the prisoners engaged in peaceful prayer. The officials forced Nealy to stop praying during the last minute of his prayer—the moment when, in Islamic tradition, practitioners feel closest to God. They handcuffed Nealy so tightly that he was left with lasting injuries to his wrists. And, angered by the prisoners' refusal to instantly end their prayer, the prison then suspended Jumu'ah prayer services for eight weeks.

Every Friday, Nealy's religion requires him to attend Jumu'ah prayer—an obligatory, sacred practice for Muslim men. Jumu'ah prayer is when Nealy congregates with fellow Muslims, as mandated by one of the core beliefs of Islam. But officials at the Arizona state prison where Nealy is imprisoned consistently interfere with his right to attend Jumu'ah prayer. Through pretextual delays, interruptions, and outright displays of animus, the prison's officials thwart Nealy from freely exercising his religion.

Nealy sued the prison officials, but the district court granted Defendants' motion for summary judgment, holding that Nealy had not shown that the interruption of his Jumu'ah prayer substantially burdened his religious beliefs under either the First Amendment or the Religious Land Use and Institutionalized Persons Act (RLUIPA). As to the eight-week suspension of services, the court held that no reasonable jury could find that Defendants

1

were involved with the suspension decision and that Nealy's RLUIPA claim was moot.

The district court got it wrong. The important guarantees of the First Amendment, strengthened in RLUIPA, protect Nealy's right to practice his faith through uninterrupted congregational prayer. Both the First Amendment and RLUIPA prohibit infringements on the free exercise of religion that are motivated by the kind of anti-Muslim animus displayed here. Defendants cannot connect their vaguely stated interest in security and orderliness to their arbitrary denial of the thirty seconds needed for prisoners to finish praying. Nor can they relate the eight-week prayer suspension to prison safety because Jumu'ah services ran exactly the same before and after the suspension. At the least, Nealy has raised disputes of material fact precluding summary judgment on his First Amendment and RLUIPA claims. This Court should reverse.

## Statement of Jurisdiction

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. On July 19, 2022, the district court entered summary judgment in favor of Defendants, disposing of some of Nealy's claims. On March 1, 2023, the district court entered a second summary-judgment order in favor of Defendants, disposing of all of Nealy's remaining claims. Nealy filed a notice of appeal on March 15, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

The Qur'an mandates Jumu'ah prayer every Friday. Jumu'ah is a religious exercise central to the practice of Islam that calls for a practitioner's undivided attention. The issues presented are:

**I.** Whether the prison officials' forceful interruption of Jumu'ah prayer violated the Free Exercise Clause of the First Amendment or the Religious Land Use and Institutionalized Persons Act.

**II.** Whether the prison officials' eight-week suspension of Jumu'ah prayer violated the Free Exercise Clause of the First Amendment or the Religious Land Use and Institutionalized Persons Act.

## Constitutional and Statutory Addendum

Pertinent constitutional and statutory provisions appear in the addendum to this brief.

## Statement of the Case

### I.     Factual background

**A. Mr. Nealy and his devout Islamic beliefs.** Plaintiff-Appellant Charles E. Nealy, Jr., is a devout Muslim currently confined in the Arizona State Prison Complex at Eyman, a part of the Arizona Department of Corrections. ER-79, 81. A critical aspect of Nealy's faith is a mandatory Friday prayer called Jumu'ah, which must be performed in congregation with other Muslims. *See* ER-111.

In Islam, "excellence of prayer" through focused, silent concentration on Allah "is the foremost duty of a Muslim and the chief of the pillars upon

which … Islam stands"—the "distinguishing feature between a Muslim and a non-Muslim." ER-108. Among Islamic religious practices, Jumu'ah prayer is uniquely important. During Jumu'ah, "deep concentration of [the] mind towards the remembrance of the Almighty" is so critical that "everything that diverts the attention of the worshipper and breaks its solemnity is either abominable or unlawful." ER-40. Anything that diverts a praying Muslim's attention away from Allah during Jumu'ah is *haram*—a grave sin—and must be ignored. ER-108, 131.

**B. The November 2019 incident.** Nealy is confined to his cell for twenty-three hours a day. ER-128. He and the other Muslim prisoners at Eyman, however, are formally allowed to participate in Jumu'ah prayer every Friday. Despite that official permission, *see, e.g.*, ER-93 (gate pass permitting Nealy to attend Jumu'ah), Nealy experiences consistent difficulties attending Jumu'ah. In 2019, those barriers stemmed from the prison chaplain Melvin Willis's reluctance to ensure that Muslim prisoners were brought to the classroom for services as Willis was required to do. ER-126, 37. When the prisoners told Willis they were having problems being brought to prayer, he dismissed their concerns, saying, "[y]ou guys are lucky to even be having a Jumu'ah prayer." ER-124.

One Friday in November 2019, Chaplain Willis and other prison officials went a step further, violating the critical Islamic mandate of silent, focused, and uninterrupted prayer. Jumu'ah prayer at the prison typically runs from 12:30 p.m. to 1:30 p.m. each Friday. ER-121. Twelve to fifteen Muslim

prisoners were supposed to be brought to Classroom Two around 12:15 p.m. so that the prayer could begin at 12:30 p.m. ER-124.

When Nealy arrived at the classroom around 12:15 p.m., he realized that the majority of his congregation was absent, ER-124, including a fellow prisoner who served as the imam and led Jumu'ah services, ER-32. Over the next half-hour, Nealy asked Willis three times to bring the rest of the Muslim prisoners to the classroom so they could begin prayer. ER-124.

After Willis denied Nealy's third request, Nealy went just outside the classroom and asked a corrections officer standing in the adjacent yard to bring the missing Muslim prisoners to prayer. ER-124. That officer promptly used his radio to call for the other prisoners. *Id.* The rest of the Muslim prisoners, including the imam, ER-32, were brought to Classroom Two within five minutes of Nealy's request to the corrections officer. ER-124. Services finally began shortly thereafter, around 1 p.m. *Id.*

About ten minutes into the prayer service, the congregants were suddenly interrupted by Chaplain Willis and Sergeant Caroline Milligan. ER-124. Milligan stopped the prayer because Willis had falsely complained that prisoners, presumably referring to Nealy, had been violating orders to stay in the classroom. ER-120, 124. Willis, however, had never told the prisoners that they were not permitted to leave the classroom. ER-126-27. And Nealy had gone no farther than just outside the classroom to ask the corrections officer in the yard to call the rest of the Muslim prisoners to prayer. ER-124.

Willis was "irritated" that "it ha[d] been a pattern for [Muslim prisoners] to tell [him] in a demanding way what to do" and that the yard corrections officer had assisted Nealy. ER-121. After Willis asked Milligan to tell the prisoners that their behavior had been "unacceptable," Milligan interrupted the prayer and told the prisoners that if they did not obey orders, they would be removed from Jumu'ah prayer. ER-120. She also threatened to ensure that "[they] would not have Jumah prayer anymore." ER-57. During Milligan's lecture, according to Willis, one prisoner "kept asking bold, challenging, aggressively strong questions," including whether the interruption would be subtracted from their allotted prayer time. ER-121. In response, Willis told the prisoners that he would let them meet until 1:40 p.m. *Id.*

At 1:38 p.m., Willis called Milligan to tell her the prayer meeting was over, even though he had told the prisoners the prayer would end at 1:40 p.m. ER-121. Milligan returned to the classroom immediately, at 1:38 p.m. ER-133. Though Willis reported to Milligan that the prayer meeting had ended, that was untrue—in fact, Milligan observed on arrival that the prisoners "were still engaged in prayer with their heads down." ER-120. Nevertheless, she directed the prisoners to end their prayer. *Id.* Because the prisoners were focused on their prayer, as Islam mandates, they did not immediately stop praying. *Id.*

Willis speculated, without citing reasons or evidence, that the prisoners were "intentionally delaying." ER-121. One prisoner held up his finger to indicate to Milligan that the group heard her but needed more time. ER-34.

6

Even though Milligan understood this signal to indicate that she should wait, ER-134, Milligan and other officers "attack[ed] the prayer service while all members were in the prayer position, yelled obscenities, [and] denounce[d] the Muslim religion," ER-82. During the prayer interruption, Milligan and Willis called the prisoners "terrorists." ER-127.

When the prayer ended, Nealy and the other worshippers got up "in a peaceful demeanor and complied with all the directives." ER-125. Despite that compliance, Milligan activated the incident command system (ICS), the prison's emergency response network, at around 1:42 p.m. ER-133. Ten to fourteen ICS officers responded. ER-121. Though Nealy and the other prisoners had folded their prayer rugs and were ready to return to their cells, Milligan insisted on continuing the ICS response, saying, "No, no, no. I want them all in handcuffs." ER-125. When Nealy told the officer who had handcuffed him, Officer Hall, that the cuffs were too tight and were hurting him, Hall responded with a cruel joke: "Oh, don't worry about it. We'll fix it when I take them off." *Id.* Watching this ICS response made Chaplain Willis feel, in his own words, "inspired." ER-121.

All worshippers were back in their cells without incident in under fifteen minutes. ER-120. Nealy has since been required to undergo extensive physical therapy to regain function in his wrist. ER-100, 104. Defendants later justified the interruption only as an exercise of their authority to ensure that prayer sessions "end at a particular time" "depending on … security needs." ER-138. Yet after the incident, Milligan apologized to Nealy,

7

explaining that Chaplain Willis had led her to believe that the prisoners were disobeying orders and that she therefore interrupted the prayer "under false pretense by Chaplain Willis." ER-126.

**C. Defendants' eight-week suspension of Jumu'ah prayer and its aftermath.** After interrupting the prayer, the prison suspended Jumu'ah services for eight consecutive weeks. ER-59. Seeking to justify the suspension, prison officials asserted that "inmates were refusing all directives" during the November 2019 incident. *Id.* In response to a grievance filed by Nealy, Willis declared that the eight-week suspension had been determined "[i]n consultation with Chaplain Henry," the prison's senior chaplain. ER-38. Jumu'ah prayer could resume later, Willis went on, if the prayer was conducted in a "safe, secure, and orderly manner." *Id.* An internal email from Henry noted that the suspension would be reviewed two weeks after it was imposed, but there is no evidence this review ever occurred. ER-55. Throughout the eight-week suspension, other (non-Islamic) religious services at the prison continued. ER-105.

In addition to the eight-week suspension, every Jumu'ah attendee was disciplined. ER-84. Nealy was not only deprived of a mandatory aspect of his religion for eight weeks; the prison also revoked thirty days of earned release credits and required him to perform thirty hours of extra duty, among other punishments. ER-95. After Nealy appealed these punishments, the prison warden dismissed the charges and revoked the punishments because prison due-process requirements had not been met. ER-99.

8

Unfortunately, Nealy continues to face barriers to his religious exercise. Prison officials denied Nealy's request for prayer beads and a prayer rug, which are necessary for the proper practice of even private Muslim prayer. ER-128. The prison has also continued to suspend Jumu'ah services. In one instance, the prison cited a staffing shortage to justify a two-week suspension. ER-47-48. But when Nealy asked an officer near his cell why there would be no Jumu'ah service during this period, the officer responded, "I don't know what the hold up is, we are not short of staff." ER-49.

## II.     Procedural history and decision below

Nealy sued Milligan, Chaplain Willis, and a Doe defendant under 42 U.S.C. § 1983 for violating his right to freely exercise his religion under the Free Exercise Clause and under RLUIPA. ER-79-80. Officer Hall was later substituted for the Doe defendant. *Id.* Nealy challenged both the interruption of the November 2019 Jumu'ah service and the eight-week suspension and sought damages as well as declarative and injunctive relief. ER-141-61.[1]

Defendants moved for summary judgment on all claims relating to the November 2019 interruption. ER-132. They argued that the short reduction in allotted prayer time was not a substantial burden on Nealy's First

---

[1] Nealy also alleged an excessive-force claim arising from the forceful interruption of the Jumu'ah prayer service in November 2019. ER-10. The district court severed that claim. ER-16-17. In light of the severance, Nealy is pursuing relief on that claim in a separate suit, No. 2:21-cv-02234-DLR-JFM (D. Ariz.).

Amendment right to exercise his religion and that, in any event, Defendants were entitled to qualified immunity on Nealy's damages claims. ER-137-38.

The district court granted Defendants' motion regarding the interruption of the prayer service, concluding that Nealy failed to show that the interruption amounted to a substantial burden on his religious exercise under either RLUIPA or the First Amendment because a short, one-time interruption was, in the court's view, nothing more than an "inconvenience." ER-88.

The district court later also granted summary judgment regarding the eight-week suspension of Jumu'ah services. ER-30. On Nealy's First Amendment claim, the court held that no reasonable jury could conclude that the particular named defendants were involved in the decision to suspend Jumu'ah. ER-28. The district court did not, however, reconcile that holding with a document indicating that Defendant Willis had, in fact, consulted with another chaplain about suspending Jumu'ah services. *Id.* The district judge also rejected Nealy's RLUIPA claims. ER-27. After observing that, in this Circuit, damages are not available under RLUIPA, *see, e.g.*, *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014), the court held that Nealy's claims for prospective injunctive relief were moot. *Id.*

## Summary of Argument

**I.A.** The district court misapplied Free Exercise Clause doctrine in evaluating the Jumu'ah prayer interruption. Instead of considering whether the government's stated interest in prison security justified the infringement

on Nealy's rights, the district court held that the prayer interruption was an "inconvenience" that could not be a substantial burden—in other words, that impositions on religious exercise are permissible as long as they are "short-term and sporadic." *See* ER-87. In doing so, the district court implicitly concluded that a religious belief in *uninterrupted* prayer is not important enough to merit constitutional protection. Thus, the court held, disrupting the prayer did not burden Nealy's religious exercise.

That line of reasoning is flawed. A court may not substitute its judgment for the plaintiff's as to what his faith requires. *See Jones v. Slade*, 23 F.4th 1124, 1145 (9th Cir. 2022). Instead, in assessing whether a religious exercise has been burdened, the question is only whether the plaintiff sincerely believes in the practice at issue. Defendants do not dispute that Nealy sincerely believes in uninterrupted Jumu'ah prayer. The November interruption thus infringed on Nealy's sincere religious exercise, and the government must adequately justify that infringement. *See id.* at 1144.

**B.** This Court's analysis should first consider Defendants' religious animus, which is never a legitimate governmental interest and thus never an appropriate reason for a prison to interfere with a religious practice. *See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018). Nealy has raised a question of material fact as to whether the interruption was motivated by anti-Muslim animus. Contrary to the district court's suggestion that animus was irrelevant to its analysis, *see* ER-86, Defendants' animus-based infringement on Nealy's sincerely held religious beliefs

11

violated his free-exercise rights. *See Masterpiece*, 138 S. Ct. at 1732. The grant of summary judgment should be reversed for that reason alone. In any case, disputes of material fact remain as to whether the prayer interruption was related to a legitimate penological interest under *Turner v. Safley*, 482 U.S. 78 (1987). Those disputes, too, preclude summary judgment.

The grant of summary judgment on Nealy's RLUIPA claim should be reversed for similar reasons. Defendants failed to carry their heavy burden under RLUIPA of identifying a compelling governmental interest that justified the interruption. And Defendants' forceful interruption of prayer was not the least-restrictive means of achieving any interest they may have had.

**II.** The district court's grant of summary judgment on Nealy's free-exercise and RLUIPA claims based on the eight-week suspension of Jumu'ah prayers should also be reversed. The suspension was motivated by the same anti-Muslim animus that motivated the initial interruption, rendering the suspension similarly impermissible under both the Free Exercise Clause and RLUIPA. In any case, disputed issues of material fact as to whether the suspension was related to a legitimate penological interest under the *Turner* factors should not have been resolved in Defendants' favor at summary judgment. Defendants have identified no interest justifying the suspension beyond broad, unspecified concerns about safety and security that are insufficient and contested by the record. Defendants also failed to

12

demonstrate that the suspension was the least-restrictive means of achieving any interest in security they had.

**III.** Other defenses do not preclude or limit the relief Nealy seeks. Defendant Willis must face trial because record evidence that the district court failed to sufficiently consider indicates that Willis was consulted about, and therefore responsible for, the suspension of Jumu'ah prayer.

Nor are Defendants entitled to qualified immunity on Nealy's damages claims under the Free Exercise Clause. Both the prayer interruption and suspension violated clearly established law, so Defendants were on notice that their actions infringed on Nealy's constitutional rights.

The district court also erred in holding that Nealy's claims for injunctive and declaratory relief are moot. Defendants' (purported) voluntary cessation of the Jumu'ah suspension after Nealy filed internal grievances did not moot his claims because the denial of Jumu'ah services continued to occur after the eight-week suspension formally ended. In any event, the mootness exception for conduct "capable of repetition, yet evading review" applies here. *See Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985) (citation omitted). Defendants have already repeated their interference with Jumu'ah prayer, and the relatively short durations of prayer disruptions render an injunctive claim impossible to review in the time it takes to complete a federal lawsuit.

13

**Standard of Review**

The district court's grants of summary judgment are reviewed de novo. *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1311 (9th Cir. 2022). All reasonable inferences from the record must be drawn in favor of Nealy, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**Argument**

**I.    The interruption of Nealy's Jumu'ah prayer in November 2019 violated his First Amendment free-exercise rights.**

Contrary to the district court's holding, the interruption of the November Jumu'ah prayer infringed on Nealy's sincere religious exercise of uninterrupted prayer. Because a question of material fact exists as to whether the interruption was motivated by anti-Muslim animus, this Court should reverse. Alternatively, applying the factors set forth in *Turner v. Safley*, 482 U.S. 78 (1987), the interruption was not reasonably related to a legitimate penological interest.

**A.    The prayer interruption impinged on Nealy's sincere religious exercise.**

The First Amendment's Free Exercise Clause protects a prisoner's religious practice. *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987). For a religious practice to trigger potential Free Exercise Clause protection, it must be sincerely held and "rooted in religious belief" rather than in purely secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)). When

14

evaluating whether the government has infringed on a person's religious exercise, a court may not consider how important that religious belief is to his faith. *See Jones v. Slade*, 23 F.4th 1124, 1145 (9th Cir. 2022). Instead, the court asks only whether the practitioner sincerely believes in the religious exercise at issue. If the practitioner demonstrates that the challenged action infringes on his sincerely held beliefs, the burden shifts to the government to justify its conduct. *Id.* at 1144.

Though no one contests that Nealy sincerely believes in uninterrupted Jumu'ah prayer, the district court granted summary judgment because it concluded that the interruption did not substantially burden Nealy's religious exercise. ER-79, 87. Without analyzing the government's reason for the November interruption, the district court relied entirely on the short duration of the interruption, characterizing the violation of the religious mandate of uninterrupted prayer as an "inconvenience." ER-88.

But the appropriate threshold question is whether Nealy was required to violate his religious beliefs—not whether he was required to do so for a long enough period of time. Because Nealy believes in uninterrupted prayer, an interruption necessarily impinges on his sincerely held religious exercise, no matter how long the interruption lasts. Holding otherwise impermissibly devalues Nealy's belief in uninterrupted prayer. *See Slade*, 23 F.4th at 1145. As further described below (at 21-22), requiring a practitioner to violate a religious mandate for any amount of time substantially burdens his religious exercise. The government therefore must justify its conduct. *See id.* at 1144.

**B.  The interruption of Nealy's Jumu'ah prayer was motivated by religious animus.**

Once it has been established that the Free Exercise Clause is implicated, in most cases arising out of a prison's curtailment of religious exercise, the court turns immediately to the so-called *Turner* factors to assess whether the challenged practice "reasonably relate[s] to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). But *Turner*'s rational-basis standard applies "*only* to rights that are inconsistent with proper incarceration"— those rights that "must necessarily be limited in the prison context." *Johnson v. California*, 543 U.S. 499, 510 (2005) (citation omitted). Thus, for instance, *Turner* does not apply to the right not to be discriminated against on the basis of race, even when racial classifications are justified by legitimate safety interests. *See id.* at 511. That is so because "compliance with the Fourteenth Amendment's ban on racial discrimination is not only consistent with proper prison administration, but also bolsters the legitimacy of the entire criminal justice system." *Id.* at 510-11.

Here, Nealy contends that the November 2019 interruption was an act of unconstitutional religious discrimination. And he maintains that his prayer was interrupted because of impermissible anti-Muslim animus rather than some arguably legitimate reason like the safety interest justifying the regulation in *Johnson*. If animus is demonstrated, the analysis stops, and the plaintiff prevails because "government actions coupled with 'official expressions of hostility to religion … [are] inconsistent with what the Free

16

Exercise Clause requires.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, ___ F.4th ___, ___, 2023 WL 5946036, at *18 (9th Cir. Sept. 13, 2023) (en banc) (quoting *Masterpiece Cakeshop, Ltd. V. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018)).

The record indicates that the November 2019 interruption to Jumu'ah prayer was motivated by Chaplain Willis's anti-Muslim animus. For weeks before the interruption, Willis consistently refused to bring the Muslim prisoners together for Jumu'ah prayers and told them they were "lucky" to "even hav[e] a religious service." ER-126. And on the day of the interruption, Willis incited the first interruption by falsely convincing Milligan and other prison staff that Nealy and other prisoners were disobeying orders by leaving the classroom—an impossibility, as Willis never told the prisoners they could not leave the classroom. ER-126-27. Further, during the interruptions, Milligan and Willis referred to the peacefully praying Muslims as "terrorist[s]," ER-127, a statement that, standing alone, a reasonable jury could easily find evinces anti-Muslim prejudice. *See, e.g.*, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 211, 221 (4th Cir. 2016) (characterization of Muslims as terrorists demonstrated discriminatory animus); *Emad v. Boeing Co.*, No. C14-1233 MJP, 2015 WL 4743897, at *3-4 (W.D. Wash. Aug. 11, 2015) (supervisor's reference to employee as "Ali-Baba terrorist" raised a question of material fact as to whether supervisor harbored discriminatory animus toward Arabs and Muslims).

The "specific series of events leading" to the interruption, both on the day itself and in the preceding weeks, indicate that Willis was motivated by animus. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993). This Court recently held en banc that derogatory statements made by government decisionmakers disparaging a religious organization, including by calling them "charlatans" and characterizing their beliefs as "without validity," likely demonstrated impermissible animus. *Fellowship of Christian Athletes*, ___ F.4th at ___, 2023 WL 5946036, at *20. Similarly, a reasonable jury could find here that the evidence discussed above demonstrates forbidden religious animus. And, just like the teachers in *Christian Athletes*, Defendants' authority over the prisoners to whom they directed these derogatory comments "bolster[s] a finding of animus." *See id.* at *20 n.11.

Because actions motivated by religious animus can never survive scrutiny under the Free Exercise Clause, this Court should reverse the grant of summary judgment on Nealy's prayer-interruption claim. *See Masterpiece*, 138 S. Ct. at 1732.

### C. The violent interruption of Nealy's Jumu'ah prayer fails the *Turner* test.

The November 2019 prayer interruption was not justified by a legitimate penological interest, so it also fails the *Turner* test. Infringements on a prisoner's free exercise of religion are valid only when "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

This determination is made by balancing the four *Turner* factors: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the presence or "absence of ready alternatives." *Id.* at 89-90 (citations omitted). The balance weighs heavily in Nealy's favor.

**Factor one.** To evaluate whether a valid, rational connection exists, the court asks "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). If the government cannot show a legitimate and neutral objective, it automatically fails the *Turner* test. *See Turner*, 482 U.S. at 90-91; *Jones v. Slade*, 23 F.4th 1124, 1139 (2022). As already explained (at 16-18), the religious hostility undergirding Defendants' actions is not a legitimate governmental interest because religious animus is constitutionally forbidden.

In any case, Defendants' inconsistent adherence to the supposed need for strict start and stop times for prayer fails *Turner*'s neutrality requirement. This Court has emphasized that inconsistent application of a prison policy demonstrates a lack of neutrality, which may "defeat[] the rational relationship between the policy and the government's asserted justification." *Slade*, 23 F.4th at 1137. In *Slade*, the prison's ban on explicit sexual, drug-

related, and violent materials was justified by a legitimate interest in "safe, secure, and orderly operation." *Id.* at 1131. As applied, however, the prison excluded the work of Black artists while allowing access to similarly explicit content in TV shows and books about "the serial killing of young women." *Id.* at 1138. Even though restricting explicit content may serve a legitimate penological interest, those discrepancies suggested that the content-restriction policy was not rationally related to the prison's stated interest. *Id.*

Here, the prison says nothing more to support its interruption than that "[a]s a prison chaplain and a prison sergeant, it is axiomatic that Defendants had the constitutional authority to ensure that a group prayer session, on a particular day depending on the circumstances of security needs, would end at a particular time." ER-138. Even if that vague, broadly stated interest passes muster as legitimate (which itself is doubtful), it was applied inconsistently, demonstrating that the policy was not neutrally enforced. *See Slade*, 23 F.4th at 1137, 1139. Here, as in *Slade*, the record reflects that start and stop times at the Eyman prison are, in fact, discretionary and flexible. During the November 22 incident alone, the start and stop times were adjusted several times at the officers' discretion, without administrative approval. ER-121. Indeed, Willis stopped the Jumu'ah prayer at 1:38, two minutes before the scheduled stop time of 1:40. *Id.* Had he honored the stop time he set, no issues would have arisen. Though safety and security, when specifically articulated, are legitimate governmental interests, the flexibility with which Defendants could adjust times at their discretion suggests that,

at a minimum, a question of material fact exists as to whether rigidly enforcing the Jumu'ah end time served those interests.

**Factor two.** The *Turner* inquiry also considers whether "there are alternative means of exercising the right that remain open to" prisoners. *Turner*, 482 U.S. at 90. "[R]elevant to the evaluation of the second factor is … the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul." *Ward v. Walsh*, 1 F.3d 873, 878 (9th Cir. 1993). "[R]equiring a believer to defile himself by doing something that is completely forbidden by his religion is different from (and more serious than) curtailing various ways of expressing beliefs for which alternatives are available." *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997). For instance, in concluding that a prison violated a Muslim prisoner's free-exercise rights by requiring him to handle pork in contravention of his religious tenets, this Court emphasized that "there [was] no alternative means of allowing Jones to exercise his right to avoid handling pork besides not ordering him to handle pork." *Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015).

Here, Defendants' actions during Jumu'ah forced Nealy to choose between violating his deeply held religious convictions and not responding immediately to prison officials. He did not respond to Defendants' commands for thirty seconds, a violation of prison policy that subjected him to violent apprehension and discipline, including the loss of earned release credits and other privileges. But heeding the commands would have

21

contravened his religious beliefs, which require him not to break concentration during Jumu'ah prayer. As authoritative Islamic commentary says, "[E]verything that diverts the attention of the worshipper and breaks its solemnity is either abominable or unlawful, as in that case, the very object of prayer is frustrated[.]" ER-40.

Requiring a Muslim to interrupt his Jumu'ah prayer is akin to requiring him to handle pork. *See Williams*, 791 F.3d at 1033. In both situations, no alternatives to defiling religious mandates exist. Once a believer has entered the sacred meditative space near the close of prayer, he cannot break concentration without violating a core religious tenet. The challenged interruption is therefore best understood not as a curtailment of Jumu'ah prayer, but as an order to violate a religious commandment.

**Factor three**. *Turner* also considers the ripple effects of granting an accommodation to a prison policy, including the "impact accommodation … will have on guards and other inmates, and on the allocation of prison resources generally." *Ward*, 1 F.3d at 878. Defendants have failed entirely to meet their burden on this factor. They have pointed to no ripple effects that would flow from allowing Jumu'ah worshippers to pray uninterrupted.

**Factor four.** The existence of "obvious, easy" alternatives to a prison's policy demonstrate that, far from being reasonable, the policy is an "exaggerated response" to the stated concerns. *Turner*, 482 U.S. at 90-91.

Here, there were many easy alternatives to the multiple interruptions and violent ICS response by ten to fourteen officers, ER-121, who handcuffed

Nealy and the other peaceful and cooperative prisoners, ER-125. Defendants could have waited for the prayer to end before instructing the prisoners not to leave the prayer room in the future. They could have allowed the prisoners thirty seconds to one minute to finish praying or offered a make-up session at a later time. At the very least, they could have discontinued the ICS response once it was clear that the prayer was over and the prisoners were obeying, rather than insisting on handcuffing nonviolent prisoners who posed no threat. In short, myriad alternatives existed. The presence of these obvious alternatives shows that the interruptions, justified by the purported need to enforce start and stop times, were unreasonable as applied to Nealy.

\* \* \*

Individually and collectively, the four *Turner* factors weigh in Nealy's favor. Defendants have cited only vague interests in security and orderliness, which have not been applied neutrally. Nealy had no alternative to defiling his religious mandates other than being permitted to finish his prayer, and Defendants have not cited any impact that would result from accommodating his sincerely held beliefs. And a host of alternatives remained open to the prison. The unnecessary, illegitimate interruptions therefore violated Nealy's free-exercise rights, and this Court should reverse the grant of summary judgment.

### D. Defendants are not entitled to qualified immunity.

Defendants are not entitled to qualified immunity as to Nealy's Free Exercise Clause claim because they violated a constitutional right that was "clearly established" at the time of the violation, putting Defendants on notice that their conduct was unlawful. *See Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014).

"To be clearly established the law must 'be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Malik v. Brown*, 71 F.3d 724 (9th Cir. 1995) (citation omitted). Well before the November 2019 incident, this Court upheld an injunction preventing prison staff from punishing prisoners for missing work to attend Jumu'ah services because that policy likely violated the Free Exercise Clause. *See Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001).

And, across the circuits, courts have held that hindering Muslim prisoners' access to prayer violates the Free Exercise Clause. *See McEachin v. McGuinnis*, 357 F.3d 197, 203-204 (2d Cir. 2004) (holding that the district court erred in dismissing Muslim prisoner's complaint that giving prisoner commands while he was praying violated the First Amendment); *Maye v. Klee*, 915 F.3d 1076, 1087 (6th Cir. 2019) (holding that prison chaplain was not entitled to qualified immunity for preventing Muslim prisoner from participating in religious feast that included a congregational prayer).

In sum, Defendants were on notice that interrupting Nealy's prayer violated his clearly established rights and thus are not entitled to qualified immunity.

## II. The prayer interruption also violated Nealy's rights under RLUIPA.

The November prayer interruption also infringed upon Nealy's rights under RLUIPA. RLUIPA is more expansive than the First Amendment, and bars the government from imposing "a substantial burden on the religious exercise of a person … unless the government demonstrates that imposition of the burden … 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. Congress instructed that RLUIPA be construed "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." *Id.* § 2000cc-3(g).

Under RLUIPA, the first step is to identify the relevant religious exercise, which applies to the particular practices within a religion at issue, rather than religious practice in general. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008). The district court held that the November interruption did not violate Nealy's RLUIPA rights for the same reason that it rejected his First Amendment claim—the short duration of the interruption. ER-88. In doing so, the district court described Nealy's religious exercise as the right to Jumu'ah prayer generally, which is impermissible under RLUIPA *and*

mischaracterizes Nealy's claim. As explained earlier (at 14-15), the religious exercise undergirding Nealy's claim is the *uninterrupted* Jumu'ah prayer mandated by Nealy's Muslim faith. As this Court has held, "it [is] error for the district court to re-characterize [plaintiff's] religious obligations at a higher level of generality." *Jones v. Slade*, 23 F.4th 1124, 1142 (9th Cir. 2022). Accordingly, disrupting Nealy's prayer substantially burdened his religious exercise understood at the appropriate level of generality—that is, uninterrupted prayer. The interruption thus must survive RLUIPA's strict-scrutiny standard. Because no compelling governmental interest exists to justify that conduct, Defendants violated RLUIPA.

### A. The violent interruption of the prayer imposed a substantial burden on Nealy's religious exercise.

The November 2019 interruption substantially burdened Nealy's religious exercise under RLUIPA. "[G]overnment action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs." *Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015). A religious exercise is substantially burdened when the practitioner is forced to choose between "engag[ing] in conduct that seriously violates [his] religious beliefs" and facing "serious disciplinary action." *Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (citation omitted) (brackets in original).

26

As already described (at 21-22), by interrupting Jumu'ah services and demanding that Muslim prisoners stop praying, Defendants forced Nealy to "seriously violate[] his religious beliefs," or else face "serious disciplinary action," *Holt*, 574 U.S. at 361; *see* ER-40. Indeed, Defendants imposed severe punishments on Nealy because he did not stop praying. ER-95.

The district court dismissed the interruption as an "inconvenience," too brief and sporadic to constitute a substantial burden. ER-88. But courts may not consider the centrality of a sincere religious belief in their analyses. *See Jones v. Slade*, 23 F.4th 1124, 1145 (9th Cir. 2022). So, by emphasizing the brevity of the interruption, the district court ignored what matters. An interruption of *any* length substantially burdens the Islamic religious mandate of uninterrupted prayer, which Nealy sincerely believes he is required to perform. In holding otherwise, the court engaged in the "unacceptable business" of "evaluating the relative merits of … religious claims." *Emp. Div. v. Smith*, 494 U.S. 872, 887 (1990) (citation omitted).

Defendants and the district court relied on *Canell v. Lightner*, 143 F.3d 1210 (9th Cir. 1998), a Free Exercise Clause case, for the proposition that relatively short, sporadic interruptions to prayer do not qualify as substantial burdens under RLUIPA. *Canell* involved a correctional officer who sang Christian songs and preached to prisoners, including during one prisoner's *personal* Muslim prayers. *Id.* at 1211-12. That prisoner was not faced with the violent interruptions at issue here, nor the coercive choice between defiling a religious mandate or ignoring an officer's orders. More

27

fundamentally, reliance on *Canell* or other cases upholding general time limits on group prayer, *see, e.g.*, *Hartmann v. Cal. Dep't of Corrs. and Rehab.*, 707 F.3d 1114 (9th Cir. 2013), is misplaced. Whether a "short-term and sporadic" burden, *Canell*, 143 F.3d at 1215, is substantial necessarily depends on the religious exercise at issue—neither *Canell* nor *Hartman* had anything to do with Jumu'ah prayer. Unlike in those cases, the gravity of the burden imposed on Nealy stems from Jumu'ah's mandate of uninterrupted, focused prayer.

### B. Defendants did not meet their burden under RLUIPA.

**Defendants lacked a compelling governmental interest**. After a plaintiff has demonstrated a substantial burden, the inquiry shifts to the defendant to make the "exceptionally demanding" showing that its action reflected the least-restrictive means of furthering a compelling governmental interest. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

Though courts accord prison officials some deference in applying prison rules, RLUIPA requires prisons to show that denying an accommodation to the individual practitioner "*actually furthers* … the [government's] interest." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (emphasis added). In applying "RLUIPA's rigorous standard," prison policies may not be afforded "unquestioning acceptance." *Id.*

As discussed (at 16-18), Defendants were motivated by animus in interrupting Nealy's prayer, which is not (of course) a legitimate

28

governmental interest. But even putting that aside and considering Defendants' broadly formulated interests in safety and orderliness, Defendants have failed to demonstrate any connection between those interests and stopping Nealy's congregational prayer thirty to sixty seconds early. Summary judgment was thus inappropriate because Defendants have not shown that permitting Nealy to complete the final moments of prayer—which, from prior experience, Chaplain Willis knew would last under one minute, ER-125—would impede the prison's safety interest.

In *Holt*, the government failed to justify its refusal to grant a Muslim prisoner a religious exception to the prison's no-beard policy to allow him to grow a religiously mandated half-inch beard. *See Holt*, 574 U.S. 355-56. The government asserted an interest in suppressing contraband hidden in prisoners' beards. *Id.* at 363-64. Although an interest in suppressing contraband was compelling, the Supreme Court held that refusing to grant a religious exception did not further that interest because it wasn't clear that a half-inch beard could actually conceal contraband more effectively than hair on a prisoner's head, which prisoners were permitted to grow longer than a half-inch. *Id.* at 364-65.

Similarly, forcing a group of kneeling, quietly praying prisoners to stop praying thirty to sixty seconds early did not serve the prison's legitimate interests in security or orderliness. By holding up a finger, the prisoners indicated that staff need wait only briefly, and staff understood that message. ER-134. Once the prayer ended, Nealy and every other Muslim

29

prisoner present immediately complied with the officers' orders. ER-125. Defendants have not shown that refusing to allow Nealy to finish his prayer in any way actually furthered the prison's interest in safety. If anything, interrupting a silent, peaceful prayer with a dozen officers undermined the prison's safety interest by infusing government force into an otherwise benign situation—needlessly escalating a routine, peaceful practice into a violent altercation.

**Defendants did not use the least-restrictive means.** Defendants also failed to meet RLUIPA's "exceptionally demanding" least-restrictive-means standard, which requires the government to "show[] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). To meet their burden, Defendants must show that they "actually considered and rejected the efficacy of less restrictive measures." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005). If a less-restrictive way exists to accommodate a religious exercise while maintaining the government's ability to fulfill its security interests, the government must employ it.

In *Holt*, the Court reasoned that even if the prison could show that prohibiting a half-inch beard furthered a compelling safety interest, refusing a religious exemption still violated RLUIPA because that interest could be fully served through common-sense alternatives, such as having the prisoner comb his beard, allowing guards to search his beard, or shaking his beard out. 574 U.S. at 365. Here, as explained (at 22-23), several less-

restrictive alternatives were available to the prison officials, such as waiting a minute until completion of the prayer, ensuring that prisoners were brought to the classroom in time to have the full hour of prayer, or curtailing the security response when the prisoners cooperated after completing their prayer.

### III. The eight-week suspension of the Jumu'ah prayer services violated Nealy's free-exercise rights.

After violently interrupting Nealy's prayer, Chaplain Willis made things even worse. To punish Nealy and the other inmates for not instantly ending their prayer, Defendants suspended Jumu'ah prayer in Nealy's housing unit for eight weeks. ER-84. The district court dismissed Nealy's claims pertaining to the suspension, reasoning that "no reasonable jury could conclude that Defendants … were personally involved with the decision to suspend Jumu'ah prayer services." ER-28. The record, however, refutes that finding, reflecting that Willis was involved in suspending Jumu'ah prayer for eight weeks. And doing so violated Nealy's free-exercise rights.

### A. The record indicates that Chaplain Willis was involved in the decision to suspend Jumu'ah for eight weeks.

To establish liability under Section 1983, the plaintiff must show that the official he sued "was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). That standard was met here.

31

Shortly after the interruption, in an Inmate Letter Response to Nealy's grievance, Chaplain Willis acknowledged that "[i]n consultation with Chaplain Henry, SMU I Jumah [sic] services are scheduled to resume 01-24-2020." ER-38. Willis asserted below that he did not participate in the decision to suspend Jumu'ah services, ER-36, but his response to Nealy contradicts that assertion. "Consultation," the word Willis himself used, means "a conference in which the parties consult and deliberate; a meeting for deliberation or discussion." *Consultation*, OED.com, https://www.oed.com /search/dictionary/?scope=Entries&q= consultation+ (last visited Oct. 4, 2023). "Consult" means "to take counsel with; to seek advice from." *Consult*, OED.com, https://www.oed.com/dictionary/consult_v?tab=meaning _and_ use#8407602 (last visited Oct. 3, 2023). Thus, by his own admission, Willis deliberated with Chaplain Henry about suspending the prayer and when it should resume. He was therefore among the decisionmakers who suspended the services—or, at least, a reasonable jury could make that determination. Willis's letter to Nealy also noted that before Jumu'ah prayer could resume, "the services must be conducted in a safe, secure, and orderly manner." ER-38. This statement indicates that Willis was involved in policing the conditions required for services to resume.

Though Defendants view the evidence differently, a reasonable jury could find that Willis participated in the suspension decision based on the summary-judgment record. Nealy's Section 1983 claim therefore survives summary judgment.

**B.    In violation of the Free Exercise Clause, Defendants discriminated against Nealy on the basis of religion.**

As noted earlier, the Free Exercise Clause is implicated when a plaintiff's belief is sincerely held and rooted in religious belief. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). Defendants do not contest that Nealy's beliefs are sincerely held and deeply rooted. "There is no question that respondents' sincerely held religious beliefs compelled attendance at Jumu'ah." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 345 (1987). Because Defendants' suspension of Jumu'ah for eight weeks was motivated by religious animus, it violated the Free Exercise Clause. Moreover, the suspension was unlawful under *Turner v. Safley*, 482 U.S. 78 (1987), because it was not reasonably related to a legitimate penological interest.

**1.    The suspension of Jumu'ah prayer was motivated by impermissible animus.**

Defendants' religious animus toward Nealy and the Islamic faith motivated their eight-week suspension of Jumu'ah prayers. And "government action motivated by religious animus cannot be 'narrowly tailored to advance' 'a compelling governmental interest.'" *Ashaheed v. Currington*, 7 F.4th 1236, 1244-45 (10th Cir. 2021) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

Beyond the animus leading up to and causing the November interruption, (at 16-18), further evidence indicates that the suspension of Jumu'ah prayer was itself motivated by that same animus. The only

(purported) interest asserted by Defendants in support of the suspension was that, following the prisoners' refusal to instantly end the November prayer, services had to be stopped until they could resume in a "safe, secure, and orderly manner." ER-38, 75-76. But the inconsistent, targeted nature of the prison's actions indicate that its asserted security interest was pretext for animus.

First, Defendants fail to point to any evidence showing that, during the eight-week suspension, they considered modifications to the Jumu'ah services so they could be conducted more safely. Although Defendants stated in an internal email that they would review the status of Jumu'ah prayers in "a couple [of] weeks," they never articulated what aspect of that "status" they planned to review or what had necessitated the suspension in the first place. *See* ER-55. They provided no details about purported safety and security concerns that were addressed, let alone resolved, during the eight-week suspension. Nor did they implement any administrative procedures after the suspension to promote safety at future Jumu'ah sessions. *See* ER-54. Indeed, Defendants cite no evidence indicating that Jumu'ah services ran any differently before and after the suspension. On this record, then, Defendants are not entitled to summary judgment, and Nealy is entitled to maintain at trial that Defendants' assertion of a security interest was pretext for the actual interest in suspending Jumu'ah services—their anti-Muslim animus.

34

Moreover, services for other religions continued throughout the suspension. *See* ER-128; ER-47 ("Jumah prayer has been canceled for two Fridays in a row with no good explanation why other religious services has been turned out both weeks with no delay."). And treating members of one religion less favorably than others by not permitting Muslim inmates to worship like everyone else demonstrates animus. The Tenth Circuit recently held that a prison official acted with animus toward a Muslim prisoner by allowing prisoners of other faiths to keep religious items under exceptions to prison policies, but not allowing Muslim prisoners a religious exception to the prison's grooming policy. *See Ashaheed*, 7 F.4th at 1244.

Defendants may seek to explain away this discriminatory treatment by emphasizing that only Muslim inmates "refused directives" and therefore only Muslim prayer services had to be suspended. ER-53. But, as explained (at 34), no changes were made to the prayers during the suspension to increase safety. So, Defendants can mean only that the suspension was a form of punishment. Indeed, the district court characterized the suspension as a "sanction." ER-84. But restricting religious rights is not a permissible form of punishment under the prison's own policies. The prison's Department Order Manual states that wardens shall "ensure inmates are not denied access to approved religious items or opportunities as part of the sanctions of disciplinary isolation." ER-118. So, either the prison imposed disproportionately harsh punishments on Muslim prisoners in violation of

35

its rules, or it disfavored Muslim services for some other reason. Both demonstrate animus—or, again, at least a reasonable jury could believe so.

### 2. Defendants' eight-week suspension of Jumu'ah prayer was not reasonably related to a legitimate penological interest.

In any case, turning to the *Turner* factors, the eight-week suspension was not "reasonably related to legitimate penological interests." 482 U.S. at 89. As already explained, to determine the constitutionality of prison conduct, courts consider the following four factors: (1) whether there is a "valid, rational connection" between the prison action and the stated governmental interest, (2) whether there are alternative means of exercising the right infringed on, (3) the impact that accommodating the constitutional right will have on the prison and prison resources, and (4) whether there is an absence of ready alternatives through which the prison can fulfill its interest. *Id.* at 90-91.

**Factor one:** As already shown (at 33-36), Defendants lacked a legitimate reason for suspending Jumu'ah prayers because the suspension was motivated by animus. And despite Defendants' claimed security interest in the eight-week suspension, as explained (at 34), the record does not support this interest because no new safety procedures were implemented after the suspension.

**Factor two:** The question here is whether Nealy's "religious practice has been so dramatically curtailed in prison" that he lacked alternative means to engage in religious expression beyond private prayer. *Ward v. Walsh*, 1 F.3d

36

873, 878 (9th Cir. 1993). In *Ward*, this Court held that the second factor weighed in the prisoner's favor because his religious practice was extensively limited—he did not have access to an Orthodox rabbi or religious services and could not congregate with fellow practitioners for prayer. *Id.* Like the prisoner in *Ward*, Nealy's religious practice was drastically restricted because Defendants prevented him from participating in Jumu'ah prayer. ER-128. Prior to the suspension, Nealy could pray each week with twelve to fifteen members of his faith, but during the entire eight-week suspension, he had no way to pray with fellow practitioners. ER-124.

Without Jumu'ah, Nealy had few, if any, other opportunities to engage in religious exercise. The Supreme Court has upheld a prison policy that prevented Muslim inmates assigned to work outside the prison from returning during the workday to attend Jumu'ah, in part because those prisoners had other opportunities to congregate in Muslim prayer. *See O'Lone v. Est. of Shabazz*, 482 U.S. 342, 350-51 (1987). Here, by contrast, Nealy had no alternative means to engage in congregational prayer. Unlike in *O'Lone*, where Muslim prisoners could gather for prayer outside of the designated Jumu'ah prayer time, Nealy was locked in his cell, alone, for twenty-three hours a day. ER-128. He was prevented from engaging in any Muslim group prayers at all. Moreover, the prison later declined his requests for a prayer rug and prayer beads—religious items necessary for the practice of Islam—restricting his ability even to pray alone. *See* ER-128.

**Factor three.** Defendants have failed entirely to meet their burden of showing that allowing Jumu'ah prayer services to continue would have adversely affected prison resources. *See, e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 886-87 (9th Cir. 2008). The record indicates that continuing the services would cause no ripple effect on prison resources. The prison was equipped to accommodate Jumu'ah services before, during, and after the suspension. The prison's reinstatement of unaltered Jumu'ah services after the suspension demonstrates that the prison had the resources to maintain these services all along. *See* ER-67.

**Factor four.** The "existence of obvious, easy alternatives" to suspending Jumu'ah for eight weeks is evidence that Defendants' action was not reasonable but rather an "exaggerated response" to any prison interest. *See Turner*, 482 U.S. at 90. In *Mayweathers v. Newland*, this Court reviewed a district-court injunction against the application of a prison rule that punished Muslim prisoners who missed work to attend Jumu'ah prayer. 258 F.3d 930, 933-34 (9th Cir. 2001). This Court held that the district court's narrowly tailored injunction, which barred discipline only for unexcused absences arising from attending Jumu'ah, demonstrated that the prison regulation was an "exaggerated response" to the prison's interest in ensuring that prisoners attended work. That is so because the injunction proved that ready alternatives existed to a policy that rigidly disciplined every unexcused absence. *Id.* at 938.

Here, too, the prison's eight-week suspension of Jumu'ah prayer was an exaggerated response. The prison has alternative forms of punishment it could have imposed instead of encroaching on Nealy's religious exercise. Recall that the prison punished Nealy with thirty hours of extra duty and by revoking thirty days of earned release credits, among other sanctions. ER-95. Although these punishments were themselves harsh and were later rescinded, ER-99, their initial imposition shows that they were available to prison officials as alternatives.

* * *

Here again, all four *Turner* factors, individually and collectively, weigh in Nealy's favor. The eight-week suspension of prayer was motivated by animus, which can never have a valid, rational connection to any legitimate governmental interest. There were no alternative opportunities for Nealy to engage in a congregational prayer as mandated by his religion, and Defendants failed to meet their burden of showing that accommodating Nealy's rights would impact prison resources. And although alternative forms of punishment were open to the prison, prison officials encroached on Nealy's religious free exercise. This Court should reverse the grant of summary judgment.

### C. Defendants are not entitled to qualified immunity on Nealy's First Amendment claim relating to the eight-week suspension.

In this Circuit, it has been well established for decades that "inmates suffer irreparable injury when they are unable to attend religious services

39

that are commanded by the Qur'an." *Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001). This Court has explained that the strength of a Muslim prisoner's free-exercise claim for denial of Jumu'ah prayer stems from its explicitly Qur'an-mandated character. *Id.* Defendants thus had "fair and clear warning" that suspending Jumu'ah prayers violated the Free Exercise Clause. *See Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015). Particularly Willis—a *chaplain*—knew or should have known that his decision to suspend Jumu'ah prayer sessions for eight weeks would infringe on Nealy's free-exercise rights.

A prisoner's right to prayer has also been clearly established in other circuits. The Second Circuit held that it is "clearly established … that prison officials may not substantially burden inmates' right to religious exercise without some justification [of a legitimate penological interest]." *See Salahuddin v. Goord*, 467 F.3d 263, 275-76 (2nd Cir. 2006). Similarly, the Fourth Circuit concluded that a Muslim prisoner's free-exercise rights to congregational prayers, fasting, and Jumu'ah services during Ramadan were "clearly established at the time under … the First Amendment." *See Lovelace v. Lee*, 472 F.3d 174, 189, 199 (4th Cir. 2006). Those cases underscore that any reasonable person in Defendants' position would have understood that his conduct violated Nealy's rights under the Free Exercise Clause.

**IV.    The eight-week suspension violated Nealy's RLUIPA rights.**

As explained earlier (at 30), under RLUIPA, when the government burdens a prisoner's exercise of religion, it must demonstrate that less-restrictive means of achieving a compelling interest were first considered and properly rejected. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (2008). Defendants failed to do so here.

**Substantial burden on religious exercise.** Under RLUIPA, a court must first identify the "religious exercise" implicated by the plaintiff's claim. *See Greene*, 513 F.3d at 987-89. Here, the religious exercise infringed on is Qur'an-mandated, congregational Jumu'ah prayer. *See* ER-44.

The court next evaluates whether the prisoner's religious exercise was substantially burdened by the prison's regulation. "[A]n outright ban on a particular religious exercise is a substantial burden on that religious exercise." *See Greene*, 513 F.3d at 988. Here, the outright ban prevented Nealy from engaging in Jumu'ah prayer for eight weeks, an obviously substantial burden that "prevent[ed] [Nealy] from praying according to his faith." *Johnson v. Baker*, 23 F.4th 1209, 1214 (9th Cir. 2022); *see* ER-46 (discussing the importance of Jumu'ah prayer).

**Lack of compelling governmental interest.** After the plaintiff shows that the government substantially burdened his religious exercise, the burden shifts to the government to demonstrate a compelling interest in its policy. *See Greene*, 513 F.3d at 988. Defendants failed to carry that burden—the

suspension was motivated by impermissible religious animus, not any legitimate penological interest.

For starters, courts "may not rely on an interest the State has failed to articulate." *See Walker v. Beard*, 789 F.3d 1125, 1136 (9th Cir. 2015). Yet Defendants did not articulate with the required specificity any compelling interest in suspending prayer services. Instead, in response to Nealy's grievance, Defendants made only the vaguest reference to security and order—that because the "inmates were refusing all directives. … the services must be conducted in a safe, secure, and orderly manner" for Jumu'ah services to resume and "continue to occur." *See* ER-38. But "prison officials cannot justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison." *See Baker*, 23 F.4th at 1217 (citation omitted). The government must "demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." *Ramirez v. Collier*, 595 U.S. 411, 427 (2022) (citation omitted).

As explained earlier (at 33-36), a reasonable jury could find that Defendants' safety rationale is nothing more than pretext. When evaluated collectively, the evidence of animus leading up to the interruption, (at 16-18), the arbitrary duration of an eight-week suspension of Jumu'ah services (and not services of any other religion), and the failure to demonstrably change the services together evince that the prison lacked a legitimate governmental interest in the suspension from the start. And, as we have

shown (at 35-36), violating a prisoner's exercise of religion is not a legitimate method of punishment.

**Lack of any less-restrictive means.** Even assuming—contrary to the record—that Defendants had a compelling penological interest for the lengthy suspension, they have failed to show that the suspension was the least-restrictive means of furthering that interest. This burden of proof is analogous to the narrow tailoring required by strict-scrutiny tests. *See Walker*, 789 F.3d at 1136; *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, ___ F.4th ___, ___, 2023 WL 5946036, at *22 (9th Cir. Sept. 13, 2023) (en banc). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 815 (2000).

Here, Defendants had to show that they "actually considered and rejected the efficacy of less-restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005). A "failure of the defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." *Shakur v. Schriro*, 514 F.3d 878, 890-91 (9th Cir. 2008); *see also Elmajzoub v. Davis*, No. 319-CV-00196-MMD-CSD, 2022 WL 1537346, at *10 (D. Nev. May 13, 2022) (ban on Jumu'ah prayer not justified by security interests given other prisons could accommodate the prayer). Specifically, this Court has held that a prison failed to demonstrate that "a total ban on

43

group religious worship by maximum security prisoners at the ... jail is the least restrictive means of maintaining jail security" when it did not consider the possibility of conducting worship in the maximum-security law library. *Greene*, 513 F.3d at 989; *see also, e.g.*, *West v. Carr*, No. 17-CV-335-WMC, 2021 WL 4972419, at *16 (W.D. Wis. Oct. 26, 2021) (Jumu'ah services offered over video livestream in lieu of cancellation during staff shortage was a less-restrictive means).

Defendants did not consider any other avenues like those described above before imposing the eight-week suspension. *See Greene*, 513 F.3d at 989. Many alternatives to an outright suspension could have satisfied the prison's security interest while protecting Nealy's religious exercise. Three obvious alternatives include holding prayers over livestream, audio broadcast, or in smaller groups while working to resolve any legitimate security concerns. Even if all alternative methods of holding Jumu'ah were untenable, the most clear-cut, less-restrictive means would have been shortening the suspension. Rather than working to minimize the curtailment of Nealy's religious exercise, however, Defendants continued the eight-week suspension without any evidence that their claimed safety interest justified such a long break in services, let alone any suspension at all.

## V. Nealy's claims for declaratory and injunctive relief are not moot.

**A.** "A claim is moot if it has lost its character as a present, live controversy." *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1172-73 (9th

Cir. 2009) (citation omitted). But it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice;" otherwise, a defendant would be "free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted). A defendant's voluntary change in policy in response to litigation thus renders a claim moot only if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979) (citations omitted).

Defendants do not satisfy these requirements, so Nealy's claims for injunctive and declaratory relief remain alive. It is reasonable to infer from the record that Defendants temporarily ceased suspension of Jumu'ah prayer in response to Nealy's pre-suit complaints. In response to the suspension, on November 29, 2019, Nealy filed multiple grievances with prison administrators, which served as the mandatory prerequisites to this litigation under the Prison Litigation Reform Act. 42 U.S.C. § 1997e(a) (PLRA's mandatory exhaustion provision); *see* ER-106; ER 58-59. Defendants therefore knew that Nealy had begun the litigation process when they halted the suspension.

And it's not simply that that Defendants' conduct may recur; it *has reoccurred. See Davis*, 440 U.S at 631. The prison prevented Nealy from

45

attending Jumu'ah prayer three times after the eight-week suspension concluded. On March 27, 2020, and April 3, 2020, Jumu'ah services were cancelled due to a purported staff shortage, while services for other religions were held without delay. *See* ER 47-48. And on March 5, 2021, Nealy's name was left off the turnout sheet for Jumu'ah prayer "for some mysterious reason," and he was once again unable to attend prayers. *See* ER-50-51. In light of Defendants' continued disruption of Nealy's right to attend Jumu'ah services, their termination of the suspension in response to his internal grievances does little to assure Nealy that his religious-exercise rights are now robustly protected from government interference.

Defendants also have not demonstrated that they implemented any policies or practices that would "eradicate the effects" of the suspension. *See Davis*, 440 U.S. at 631. Defendants cite no internal guardrails that have been implemented to prevent the future cancellation or suspension of Jumu'ah prayers. Affirming the district court's mootness holding would thus allow the government to "escape the pitfalls of litigation by simply giving in to a plaintiff's individual claim without renouncing the challenged policy." *See Rosemere*, 581 F.3d at 1175.

**B.** The district court also erred in holding that Nealy's claims for injunctive and declaratory relief are moot because the challenged actions are "capable of repetition, yet evading review." *See Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985) (citation omitted). That doctrine applies when "(1) the challenged action is of limited duration, too short to be fully litigated

46

prior to its cessation or expiration and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Id.*

The first requirement is satisfied here. The varied disruptions to Nealy's access to Jumu'ah prayer, ranging from multiple interruptions in a single prayer session to an eight-week suspension of services to other arbitrary denials of service, are all far shorter than the timespan of federal litigation.

The second requirement is also satisfied, as just explained. Nealy's prayer was disrupted on three occasions after the eight-week suspension. It is thus reasonable to expect that Nealy will continue to encounter obstacles to Jumu'ah services. Injunctive relief is required to allow Nealy to practice a core tenet of his religion without disruption.

## Conclusion

This Court should reverse the district court's grants of summary judgment and remand for trial on each of Nealy's free-exercise and RLUIPA claims.

Respectfully submitted,

s/ Natasha R. Khan

Elijah Conley             Natasha R. Khan

Meghan Plambeck      Brian Wolfman

Zarah Zhao               Regina Wang

   Student Counsel       GEORGETOWN LAW APPELLATE

                             COURTS IMMERSION CLINIC

                         600 New Jersey Ave., NW, Suite 312

                         Washington, D.C. 20001

                         (202) 661-6582

Pro Bono Counsel for Plaintiff-Appellant Charles E. Nealy, Jr.

October 6, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-15385

I am the attorney or self-represented party.

**This brief contains** 11,026 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Natasha R. Khan **Date** 10/6/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# Addendum

## Addendum Table of Contents

U.S. Const. amend. 1 ................................................................................1a

42 U.S.C. §§ 2000cc-1(a) ........................................................................1a

42 U.S.C. §§ 2000cc-1(b) ........................................................................1a

42 U.S.C. §§ 2000cc-2(a) ........................................................................2a

42 U.S.C. §§ 2000cc-2(b) ........................................................................2a

42 U.S.C. §§ 2000cc-2(e) ........................................................................2a

42 U.S.C. §§ 2000cc-3(g) ........................................................................2a

42 U.S.C. §§ 2000cc-5(7)(A) ..................................................................3a

## UNITED STATES CONSTITUTION

### U.S. Const. Amend. I. Free Exercise Clause

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

### FEDERAL STATUTE

### RELIGIOUS LAND USE AND INCARCERATED PERSONS ACT
### § 2000cc-1. Protection of religious exercise of institutionalized persons

*(a) General Rule*

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> 1) is in furtherance of a compelling governmental interest; and

> 2) is the least restrictive means of furthering that compelling governmental interest.

*(b) Scope of application*

This section applies in any case in which—

> 1) the substantial burden is imposed in a program or activity that receives Federal financial assistance.

### § 2000cc-2. Judicial relief

*(a) Cause of action*

1a

A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

*(b) Burden of persuasion*

If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

*(e) Prisoners*

Nothing in this chapter shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act).

## § 2000cc-3. Rules of Construction

*(g) Broad construction*

This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.

## § 2000cc-5. Definitions

*7) Religious exercise*

(A) In general

The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.